Jeremy Pinson #16267-064
Name and Prisoner/Booking Number

USP Tucson
Place of Confinement

PO Box 24550
Mailing Address

Tucson AZ 85734
City, State, Zip Code

(Failure to notify the Court of your change of address may result in dismissal of this action.)

☒ FILED  ☐ LODGED

**May 30 2023**

CLERK U.S. DISTRICT COURT
DISTRICT OF ARIZONA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

Jeremy Vaughn Pinson,
(Full Name of Plaintiff)

Plaintiff,

v.

(1) Federal Bureau of Prisons,
(Full Name of Defendant)

(2) United States of America,

(3) Alkermes Inc.,

(4) _____,

Defendant(s).

☐ Check if there are additional Defendants and attach page 1-A listing them.

CASE NO. 22-CV-00375-RM
(To be supplied by the Clerk)

**CIVIL RIGHTS COMPLAINT
BY A PRISONER**

☐ Original Complaint
☒ First Amended Complaint
☐ Second Amended Complaint

## A. JURISDICTION

1. This Court has jurisdiction over this action pursuant to:
   ☐ 28 U.S.C. § 1343(a); 42 U.S.C. § 1983
   ☒ 28 U.S.C. § 1331; ~~Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388 (1971)~~.
   ☒ Other: FTCA, 28 U.S.C. 2671-80, and 28 U.S.C. 1332 (diversity)

2. Institution/city where violation occurred: USP Tucson

## B. DEFENDANTS

1. Name of first Defendant: Federal Bureau of Prisons. The first Defendant is employed as: Federal Agency (Position and Title) at USP Tucson/Systemwide (Institution).

2. Name of second Defendant: United States of America. The second Defendant is employed as: FTCA Defendant (Position and Title) at USP Tucson/Systemwide (Institution).

3. Name of third Defendant: Alkermes Inc. The third Defendant is employed as: Massachusetts Corporation (Position and Title) at USP Tucson/Systemwide (Institution).

4. Name of fourth Defendant: N/A. The fourth Defendant is employed as: ___ (Position and Title) at ___ (Institution).

If you name more than four Defendants, answer the questions listed above for each additional Defendant on a separate page.

## C. PREVIOUS LAWSUITS

1. Have you filed any other lawsuits while you were a prisoner? ☒ Yes ☐ No

2. If yes, how many lawsuits have you filed? 100 plus Describe the previous lawsuits:

   a. First prior lawsuit:
      1. Parties: Pinson v. USA
      2. Court and case number: D. AZ 19-CV-422-RM
      3. Result: (Was the case dismissed? Was it appealed? Is it still pending?) Pending

   b. Second prior lawsuit:
      1. Parties: Pinson v. USA
      2. Court and case number: D. AZ. 19-CV-401-RM
      3. Result: (Was the case dismissed? Was it appealed? Is it still pending?) Pending

   c. Third prior lawsuit:
      1. Parties: Pinson v. Carvajal
      2. Court and case number: D. AZ. 22-CV-00298-RM
      3. Result: (Was the case dismissed? Was it appealed? Is it still pending?) Pending

If you filed more than three lawsuits, answer the questions listed above for each additional lawsuit on a separate page.

2

## D. CAUSE OF ACTION

### COUNT I

1. State the constitutional or other federal civil right that was violated: <u>Violation of the 8th Amendment</u>.

2. **Count I.** Identify the issue involved. Check **only one**. State additional issues in separate counts.
   - ☐ Basic necessities
   - ☐ Mail
   - ☐ Access to the court
   - ☒ Medical care
   - ☐ Disciplinary proceedings
   - ☐ Property
   - ☐ Exercise of religion
   - ☐ Retaliation
   - ☐ Excessive force by an officer
   - ☐ Threat to safety
   - ☐ Other: _____

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Count I. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

   See pages 7 to 18, due to limitations on space to write details

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).
   Same as 3 above

5. **Administrative Remedies:**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution?  ☒ Yes  ☐ No
   b. Did you submit a request for administrative relief on Count I?  ☒ Yes  ☐ No
   c. Did you appeal your request for relief on Count I to the highest level?  ☐ Yes  ☒ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. No response provided, no form provided when the response due, Warden wouldn't grant extension, culture and practice of retaliation.

3

## COUNT II

1. State the constitutional or other federal civil right that was violated: Violation of the FTCA, 28 U.S.C. 2671-80.

2. **Count II.** Identify the issue involved. Check **only one**. State additional issues in separate counts.
   - ☐ Basic necessities
   - ☐ Mail
   - ☐ Access to the court
   - ☒ Medical care
   - ☐ Disciplinary proceedings
   - ☐ Property
   - ☐ Exercise of religion
   - ☐ Retaliation
   - ☐ Excessive force by an officer
   - ☐ Threat to safety
   - ☐ Other: _____

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Count II. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

   Same as Count I

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).
   Same as Count I

5. **Administrative Remedies.**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution? ☒ Yes ☐ No
   b. Did you submit a request for administrative relief on Count II? ☒ Yes ☐ No
   c. Did you appeal your request for relief on Count II to the highest level? (see Page 17) ☒ Yes ☐ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____

4

**COUNT III**

1. State the constitutional or other federal civil right that was violated: 28 U.S.C. 1332 (Diversity), negligence, Medical negligence, medical malpractice, intentional infliction of emotional distress, false and deceptive marketing, conspiracy

2. **Count III.** Identify the issue involved. Check **only one**. State additional issues in separate counts.
   - ☐ Basic necessities
   - ☐ Mail
   - ☐ Access to the court
   - ☒ Medical care
   - ☐ Disciplinary proceedings
   - ☐ Property
   - ☐ Exercise of religion
   - ☐ Retaliation
   - ☐ Excessive force by an officer
   - ☐ Threat to safety
   - ☐ Other: _____

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Count III. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

Count III claims against Alkermes Inc., and only Alkermes Inc., are also represented by the facts on Pages 7 to 18.

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).
See Pages 7 to

5. **Administrative Remedies.**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution? ☐ Yes ☒ No
   b. Did you submit a request for administrative relief on Count III? ☐ Yes ☒ No
   c. Did you appeal your request for relief on Count III to the highest level? ☐ Yes ☐ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. Alkermes is a non-governmental entity.

If you assert more than three Counts, answer the questions listed above for each additional Count on a separate page.

5

## E. REQUEST FOR RELIEF

State the relief you are seeking:

1. Damages against Alkermes Inc. in the amount equivalant to 2% of its 2022 revenues on Vivitrol; punitive damages.
2. Damages against the United States of $1,500,000.00 under FTCA.
3. Injunction enjoining BOP from denying methadone or buprenorphine for non-clinical reasons, injunction enjoining denial or delays in MAT Program treatments, injunction enjoining denial or delay in Plaintiff's own enrollment in the Challenge or RDAP Programs.
4. Award Plaintiff costs or fees.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 2-17-2023
DATE

SIGNATURE OF PLAINTIFF

_____
(Name and title of paralegal, legal assistant, or
other person who helped prepare this complaint)

_____
(Signature of attorney, if any)

_____
(Attorney's address & telephone number)

## ADDITIONAL PAGES

All questions must be answered concisely in the proper space on the form. If you need more space, you may attach no more than fifteen additional pages. But the form must be completely filled in to the extent applicable. If you attach additional pages, be sure to identify which section of the complaint is being continued and number all pages.

6

Statement of facts:

Plaintiff is a __37__ year old prisoner who has struggled with addiction for several years. S/He suffers from a chronic disease known as opioid use disorder. This disease claims the lives of one American every five minutes a day. See, Centers for Disease Control and Prevention, Opioid Overdose: Understanding the Epidemic, www.cdc.gov/drugoverdose/epidemic.

More than half a million people in the United States have died from opioid overdose, and the death toll has rapidly increased in the last five years. Opioid-related deaths in Arizona have increased exponentially in the last two years, and the opioid related death rate is 120 times higher for people released from jails and prisons as compared to the rest of the adult population.

As with other chronic diseases, opioid use disorder involves cycles of relapse and remission. Without treatment or other recovery, opioid use disorder may result in disability or premature death. Before this litigation Plaintiff has overdosed on opioids at least 5 times. Plaintiff has made numerous attempts to overcome his opioid addiction, including by seeking to enroll in residential drug abuse programs and seeking medications such as medication assisted treatment ("MAT") with methadone and buprenorphine (commonly known by the brand name suboxone®).

MAT is the standard of care for treatment of opioid use disorders and involves the use of FDA-Approved pharm-

rceutical medications, including methadone, buprenorphine and naltrexone, in combination with counseling, behavioral therapy and other interventions for the treatment of substance use disorders.

Naltrexone, brand name Vivitrol, is a non-opioid medication aimed at preventing substance abuse relapse. It was directly marketed to prisons and jails by its manufacturer, the pharmaceutical company Alkermes, because it has many known limitations relative to other available treatments. An in-house Alkermes study found it does not completely block the targeted brain receptors so its effects may be overcome with a sufficiently large quantity of opioids, as a result an in-house study by Alkermes also revealed that 30% of patients relapse with-in 28 days and a retrospective study revealed that Vivitrol patiens had overdosed and died within that same period.

Other treatments for opioid dependence include Methadone and Suboxone, both of wich contain opioids, and such are agonist treatments that work by tricking the opioid receptors in the brain into believing that it has recived the abused opioid. It also contains naloxone, also known as Narcan, an overdose reversal medication.

Recognizing that the medical community did not hold Vivitrol in high regard, Alkermes focused their efforts to convince prison wardens and law enforcement agencies that methadone and Suboxone were less effective than Vivitrol because they contain opioids and circulating misleading and deceptive information that only highlighted methadone and Suboxone's drawbacks and routinely represented to law enforcement policymakers that methadone and Suboxone were addictive and abused like illict

8

opioids despite scientific data supporting the use of methadone and Suboxone in treating opioid addiction. This aggressive and fraudulent marketing campaign paid off, a survey of criminal justice represetatives found that most favored Vivitrol ballooning Vivitrol's modest net sales of $28.9 million in 2011 to $209 million by 2016.

The first trouble for Alkermes began on June 11, 2017 when the New York Times published an article exposing Alkermes' deceptive and aggressive efforts to market Vivitrol by disparaging Suboxone and methadone without any scientific basis. Over the next two days, NPR and "The Fix" followed on the heels of the New York Times further highlighting Alkermes' attempts to suppress the use of methadone or Suboxone by lobbying for increased regulation of those drugs. ProPublica published an article on June 21, 2017 revealing Alkermes' possession of non-public, internal data showing that 30% of Vivitrol patients relapsed and the Journal of the American Medical Association published a studying Vivitrol in Oct. 2017 that noted Vivitrol's defects. Senator Kamala Harris, now Vice President Harris announced an investigation into Alkermes' sales practices relating to Vivitrol on Nov. 6, 2017. Lawsuits against Alkermes soon followed the governmental investigations.

The American Society of Addiction Medicine has issued a national practice guideline for the use of medications in the treatment of opioid addiction which concludes that methadone and buprenorphine should be used in the treatment of

9

opioid addiction.

The National Commission On Correctional Healthcare that discusses the risks and consequences of MAT states that "effective treatment for substance abuse disorders including long-term MAT has been shown to reduce these problems in Correctional Institutions" and another that says "While both Methadone and Buprenorphine treatments pose some risk of diversion within prisons and jails, evidence suggests that overall rates of illicit drug use decline following introduction of MAT."

The federal government has prosecuted individuals on the basis of their personal knowledge that "Vivitrol users are susceptible to overdose because they have an incentive to consume more heroin than usual to overcome the Vivitrol blockade" wich increased the risk of overdose and death and Vivitrol users are "physically vulnerable to the possibility of an overdose because of the Vivitrol," United States v. Bollinger, 893 F.3d 1123 (8th Cir. 2018).

Nevertheless, systemwide the BOP has urged its MAT Providers to prescribe Vivitrol. One USP Tucson MAT Provider Marshall of the U.S. Public Health Service, told inmates Jeremy Pinson "they make buprenorphine real hard and they will never allow methadone to be prescribed here" and that as a clinician here "hands are tied way above my paygrade on this". Marshall acknowledged to Pinson that Vivitrol had no opioid-overdose reversal agent like suboxone and that NarCan was not easily available to USP Tucson's staff and an opioid overdose in SMU particularly would be "certain death" but even knowing this she would "be in trouble" and "Pharmacy would kill me" if she even

10

tried to ~~pr~~ prescribe Methadone.

Medical decisions that rest on stereotypes about the disabled, wich prisoners with Opioid Use Disorder are discriminatory. The statements of Marshall, as well as USP Tucson's Clinical Director that he will never prescribe buprenorphine or Methadone to inmates, clearly shows a practice and pattern of categorical exclusions not rooted in individualized determinations of medical necessity but rather are rooted in the wildly successful, scientifically unsupported, deceptive and fraudulent marketing of pharmaceutical giant Alkermes.

Plaintiff began receiving Vivitrol on Feb. 15, 2023. Within hours the plaintiff experienced nausea, itching all over her body, vomiting, joint pain, headache and shortness of breath. Plaintiff advised nurses Cosme and Ramon Estrada and Quesada of these experienced side effects during the AM and PM pill lines asking to see her MAT Provider a mid-level practitioner named Marshall. At no point in time was plaintiff removed from her cell to be examined by any medical provider whatsoever for these symptoms of illness or potentially an allergic reaction.

Alkermes, is a Massachusetts based corporation that manufactures and processes and markets to

prisons and jails the Vivitrol drug within the state of Arizona and all 49 other states.

The "Directions for Use and Package Insert" state multiple statements concerning its administration to all patients Alkermes' drug Vivitrol. In the section titled "Warnings and Precautions" that states the following:

1. "patients are vulnerable to potentially fatal overdose"

2. "Cases of Hepatitis and clinically significant liver dysfunction were observed in association with Vivitrol"

3. "Cases of Urticaria, angioedema, and anaphylaxis have been observed with the use of Vivitrol".

4. "adverse events seen most frequently in association with Vivitrol, were induration, pruritis, nodules and swelling, muscle cramps, dizziness or Syncope, somnolence, sedation, anorexia, decreased appetite"

5. "Some cases of injection site reactions required surgical intervention".

6. "Monitor patients for the development of depression or suicidal thinking". In a separate section titled "Patient Access to Naloxone For the Emergency Treatment of Opioid overdose"

12

states in pertinent part "Discuss the availability of naloxone for the emergency treatment of opioid overdose with the patient" and "Inform patients and caregivers of their options for obtaining naloxone."

In a section titled "Vulnerability to Opioid Overdose" it states "patients are likely to have reduced tolerance to opioids... this could result in potentially life-threatening opioid intoxication (respiratory compromise or arrest, circulatory collapse, etc." and "Cases of opioid overdose with fatal outcomes have been reported in patients" and "Although Vivitrol is a potent antagonist with prolonged pharmacological effect, the blockade produced by Vivitrol is surmountable" and "Strongly consider prescribing naloxone for the emergency treatment of opioid overdose" and "emphasize the importance of calling 911 or getting emergency medical help."

Neither Alkermes nor any employee of the BOP involved in the administration of Vivitrol told plaintiff of any such risks prior to the first injection.

Plaintiff has no access to naloxone, is not

13

prescribed naloxone, has no ability to call 911 or to get emergency medical help as 1) there is no medical provider at USP Tucson between 10pm and 6am nightly, and 2) plaintiff has no ability to call 911. Further, as the Court is aware from Pinson v. Durett, No. 19-cv-00422-RM (D.Ariz.) even duress alarms in SHU don't work and are ignored routinely for periods of hours. Though rounds are conducted every 30 minutes, in the event of an opioid overdose plaintiff is unlikely to receive treatment in time to avoid a fatal outcome as it is impossible for staff to prevent such in time. The Methadone treatment BOP is refusing plaintiff would largely prevent such fatal events and BOP and Alkermes both knew this when BOP adopted Alkermes deceptive marketing disparaging methadone and buprenorphine to prison officials.

Knowing the lethality of overdose on opioids on Vivitrol the medical provider stated Methadone would "never" be administered at USP Tucson for non-clinical reasons.

Plaintiff is under no direct observation, nor is any other inmate prescribed Vivitrol, by a Medical professional qualified to treat the side effects or opioid overdose symptoms.

14

During her clinical MAT program interview the following question was posed to Marshall:

"For the record, are you not prescribing me methadone or buprenorphine for a clinical reason, or because you've been asked not to for other reasons than a medical reasons?"

Marshall replied to plaintiff "there are a lot of medical treatments we can't order because the Warden will have a fit if we do because of the risk of diversion, but I can say this they will never allow methadone here and pharmacy would kill me if I tried to give it to anyone, that's not just you, that is everybody, and that's not me that's the policymakers in Central Office making it this way" then added "Methadone is like synthetic heroin". When asked about Alkermes and its manipulation of law enforcement officials Marshall stated "I personally hate big pharma, but this is way above you and me dude". At the end plaintiff asked Marshall "so what if I overdose and die because you can't give me methadone?" and Marshall replied "Sadly, not much will change, but lawsuits do bring change and

15

if you can make it better, go for it."

But for plaintiff's incarceration, plaintiff could have gone to a methadone clinic and received treatment for her opioid use disorder and addiction. Marshall also stated if plaintiff discontinued her Lupron she could technically have prescribed buprenorphine. The plaintiff has zero risk of dying without Lupron, but is at elevated risk of dying on Vivitrol as opposed to methadone or buprenorphine. Plaintiff expressed irritation that her medical treatments were done in an effort to pursue a less-effective treatment because of Alkermes and the unknown named "policymakers" guiding her treatments and Marshall stated that "insurance companies pull this same bullshit all the time, its not right, I agree 100%."

Plaintiff receives no counseling, behavioral therapy or other interventions for substance use disorders with her Vivitrol which is standard in MAT Programs per the Substance Abuse and Mental Health Services Administration. Although the USP Tucson Challenge Program provides such treatments, and plaintiff is willing to enter the program, the Warden of USP Tucson refuses to release plaintiff from SHU in retaliation for her refusal to drop a lawsuit stemming from an unrelated incident and though

16

Plaintiff, her mother, her attorneys, other inmates, family members of other inmates have also complained of the retaliation to the BOP, Office of Inspector General, PREA Auditors of America, American Correctional Association, Congressional Representatives and Senators, LAMBDA Legal, GLAD, the ACLU, law professors, The Marshall Project, Associated Press, and others the BOP refuses to hold the Warden to account for retaliation and knowingly violating 28 C.F.R. 115.67, nor for using false information to attempt to secure her transfer. As a direct result of this BOP inaction, plaintiff remains in SHU with no access to the Challenge Program nor RDAP which separately is available in nearly 100 lesser security prisons.

While confined to USP-Coleman II in 2021 the plaintiff filed jointly with several inmates an SF-95 Claim For Damage, Injury or Death regarding her denial and delay of MAT Program enrollment, which BOP denied prior to filing this lawsuit. The exact claim number is stored in SHU property and it is not clear when she will access her paperwork to obtain it.

During her efforts to end her multi-year effort to

17

receive MAT Program treatment following passage of the First Step Act of 2018, but after BOP transferred the plaintiff to USP Tucson following settlement discussions with Magistrate Judge Maria S. Aguilar, plaintiff spoke to Asst. Health Services Administrator J. Alexander about representations on her screening for MAT made to plaintiff by Asst. Warden J. Williams and Jenna Epplin, Co-ordinator of BOP's Women and Special Populations Branch in Washington, D.C., Alexander stated to plaintiff when she mentioned Beth Schwartzapfel an investigative reporter for The Marshall Project on BOP's systemwide denials and delays of implementing MAT:

"I know you can sue, I know you will engage the press, but the squeaky wheel shouldn't get the grease. I don't care what the AW or this Epplin person said you will not get MAT at all if I make the call"

Plaintiff responded "Why?", Alexander replied "because you are a troublemaker, you file lawsuits and you'd be much better off minding your business and doing as you are told and leave it to us to decide what rights you get or don't get and as long as you enforce every little thing you got nothing coming from me. I just don't like you."

18

During a settlement discussion with AUSA Denise Faulk and an unknown named BOP Attorney in Jan. 2021 the plaintiff proposed settlement if she was released to general population or transferred to FMC Rochester. AUSA Faulk stated BOP "cannot" enter into such an agreement. Plaintiff later learned Faulk's statement was not true. Plaintiff's request to return to FMC Rochester was rooted in her desire to access better medical treatment, as during her previous stay at FMC Rochester Dr. Jason Gabel told plaintiff her medical care would come from physicians including the ones by contract from the Mayo Clinic a world-class hospital well known for its excellent treatment of illness and addiction.